1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARY O. RODRIGUES,, | Case No. 1:13-cv-01322-BAM-HC |
| Petitioner, | ORDER GRANTING RESPONDENT'S MOTION TO DISMISS THE PETITION (DOC. 14) |
| v. | ORDER DISMISSING THE PETITION FOR WRIT OF HABEAS CORPUS (DOC. 1) AND PETITIONER'S MOTIONS FOR RELEASE AND DISCOVERY (DOC. 1), DIRECTING THE ENTRY OF JUDGMENT FOR RESPONDENT, AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY |
| D. K. JOHNSON, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge to conduct all further proceedings in the case, including the entry of final judgment, by manifesting their consent in writings signed by the parties or their representatives and filed by Petitioner on September 4, 2013, and on behalf of Respondent on September 23, 2013.

Pending before the Court is Respondent's motion to dismiss the petition as untimely filed.  The motion was filed on October 22,

2013, with supporting documentation.  Petitioner filed opposition to the motion on November 12, 2013, and Respondent filed a reply on January 27, 2014.  Petitioner filed an unsoclited sur-reply on May 22, 2014.  The Court has considered the petition as well as additional materials (docs. 1, 19) submitted by Petitioner in connection with pending motions for release and for discovery.

In the petition, Petitioner challenges multiple convictions of acquisitive offenses on grounds of ineffective assistance of trial counsel.  In response to Respondent's arguments in the motion to dismiss regarding the untimeliness of the petition, Petitioner argues that the running of the statute of limitations should be 1) statutorily tolled because of the discovery of new evidence, and 2) equitably tolled based on Petitioner's actual innocence of the crimes as well as the ineffective assistance of, or abandonment by, Petitioner's retained appellate counsel.

I.   Proceeding by a Motion to Dismiss

Respondent has filed a motion to dismiss the petition on the ground that Petitioner filed his petition outside of the one-year limitation period provided for by 28 U.S.C. § 2244(d)(1) and failed to exhaust state court remedies.

Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts (Habeas Rules) allows a district court to dismiss a petition if it "plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court...."

The Ninth Circuit Court of Appeals has allowed respondents to file motions to dismiss pursuant to Rule 4 instead of answers if the motion to dismiss attacks the pleadings by claiming that the

2

petitioner has failed to exhaust state remedies or has violated the state's procedural rules.  See, e.g., O'Bremski v. Maass, 915 F.2d 418, 420 (9th Cir. 1990) (using Rule 4 to evaluate a motion to dismiss a petition for failure to exhaust state remedies); White v. Lewis, 874 F.2d 599, 602-03 (9th Cir. 1989) (using Rule 4 to review a motion to dismiss for state procedural default); Hillery v. Pulley, 533 F.Supp. 1189, 1194 & n.12 (E.D.Cal. 1982) (same).  Thus, a respondent may file a motion to dismiss after the Court orders the respondent to respond, and the Court should use Rule 4 standards to review a motion to dismiss filed before a formal answer.  See, Hillery, 533 F. Supp. at 1194 & n.12.

In this case, Respondent's motion to dismiss addresses exhaustion and the timeliness of the petition pursuant to 28 U.S.C. § 2244(d)(1).  The material facts pertinent to the motion are found in copies of the official records of state judicial proceedings which have been provided by Respondent and Petitioner, and as to which there is no genuine factual dispute.  Because Respondent has not filed a formal answer, and because Respondent's motion to dismiss is similar in procedural standing to a motion to dismiss for failure to exhaust state remedies or for state procedural default, the Court will review Respondent's motion to dismiss pursuant to its authority under Habeas Rule 4.

II.  Procedural Summary

Petitioner was convicted in the Tulare County Superior Court (TCSC) of six counts of first degree burglary, twenty counts of grand theft of personal property, three counts of possession of forged items, and seven counts of making, drawing, uttering, or delivering a check with insufficient funds.  On April 26, 2005,

3

Petitioner was sentenced to a determinate state prison term of thirteen years and four months.  (Lodged Document (LD) 1.)

On February 28, 2007, the Court of Appeal of the State of California, Fifth Appellate District (CCA) issued a reasoned decision in Petitioner's appeal in which it directed correction of the abstract of judgment to reflect a stay of execution on five counts pursuant to Cal. Pen. Code § 654 but otherwise affirmed the judgment.  (LD 2.)

Petitioner did not subsequently file in the California Supreme Court (CSC) a petition for review of the CCA's affirmance.  However, Petitioner filed four petitions for habeas corpus in the state courts.[1]

Petitioner constructively filed a petition for writ of habeas

---

[1] Dates of filing are calculated pursuant to the "mailbox rule."  Habeas Rule 3(d) provides that a paper filed by a prisoner is timely if deposited in the institution's internal mailing system on or before the last day for filing.  The rule requires the inmate to use the custodial institution's system designed for legal mail; further, timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or by a notarized statement setting forth the date of deposit and verifying prepayment of first-class postage.  Id.  Habeas Rule 3(d) reflects the "mailbox rule," initially developed in case law, pursuant to which a prisoner's pro se habeas petition is "deemed filed when he hands it over to prison authorities for mailing to the relevant court."  Houston v. Lack, 487 U.S. 266, 276 (1988); Huizar v. Carey, 273 F.3d 1220, 1222 (9th Cir. 2001).  The mailbox rule applies to federal and state petitions alike.  Campbell v. Henry, 614 F.3d 1056, 1058-59 (9th Cir. 2010) (citing Stillman v. LaMarque, 319 F.3d 1199, 1201 (9th. Cir. 2003), and Smith v. Ratelle, 323 F.3d 813, 816 n.2 (9th Cir. 2003)).  The mailbox rule, liberally applied, in effect assumes that absent evidence to the contrary, a legal document is filed on the date it was delivered to prison authorities, and a petition was delivered on the day it was signed.  Houston v. Lack, 487 U.S. at 275-76; Roberts v. Marshall, 627 F.3d 768, 770 n.1 (9th Cir. 2010); Campbell v. Henry, 614 F.3d 1056, 1058-59 (9th Cir. 2010); Lewis v. Mitchell, 173 F.Supp.2d 1057, 1058 n.1 (C.D.Cal. 2001).  The date a petition is signed may be inferred to be the earliest possible date an inmate could submit his petition to prison authorities for filing under the mailbox rule.  Jenkins v. Johnson, 330 F.3d 1146, 1149 n.2 (9th Cir. 2003), overruled on other grounds, Pace v. DiGuglielmo, 544 U.S. 408 (2005).  However, if there is a long delay between the alleged mailing and receipt by a court, a district court may attribute the discrepancy to various causes, including the court, the postal service, the prison authorities, or the prisoner himself.  See, Koch v. Ricketts, 68 F.3d 1191, 1193 n.3 (9th Cir. 1995) (concerning analogous Fed. R. App. P. 4(c)).

corpus in the TCSC on July 31, 2011, which was denied in a reasoned decision on August 9, 2011.  (LD 3, form page 6 of 6; LD 4.)

On October 18, 2011, Petitioner filed another petition for writ of habeas corpus in the TCSC.[2]  (LD 5, 1.)  On October 24, 2011, the TCSC denied the petition, stating the following:

> The Petition is summarily denied as an abuse of the writ. Petitioner [filed] this writ October 18, 2011, after an identical writ filed August 2, 2011, was denied (copy of that ruling attached).

(LD 6.)

On January 4, 2012, Petitioner filed a petition for writ of habeas corpus in the CCA.[3]  (LD 7.)  On March 8, 2012, the CCA denied the petition summarily without a statement of reasoning or citation of any authority.  (LD 8.)

On March 27, 2012, Petitioner constructively filed a petition for writ of habeas corpus in the CSC.  (LD 9, form page 6 of 6.)  On May 7, 2012, the CSC received an amended petition from Petitioner. (LD 10.)  On June 27, 2012, the CSC summarily denied the petition without a statement of reasoning or citation of authority.  (LD 11.)

Petitioner constructively filed the petition in the present proceeding on July 31, 2013.  (Doc. 1, 6.)

_____

[2] The date of filing that appears on the stamp of the CCA is used because the signature date and date of proof of service of the petition are July 31, 2011, the same signature and service date that appears on the first state habeas petition. The unexplained delay of months before the petition was filed does not support an inference that the date of signature was the date the Petitioner surrendered the petition to authorities for transmission to the appellate court.  Further, it is unlikely that Petitioner would intend to initiate two separate but parallel proceedings by filing two nearly identical petitions simultaneously.

[3] Again, the signature date and service date were July 28, 2011; thus, the date of filing was the date reflected on the file stamp of the CCA.

III.  Factual Summary

The facts are pertinent to Petitioner's claims of statutory tolling and actual innocence.

A.  Introduction

Petitioner's offenses stemmed from real estate transactions that occurred in 2001 and 2002 during and after the time when Petitioner was licensed and working as a real estate agent.  (LD 2, 2.)  There were seventeen sets of counts or victims, and the victims testified regarding each specific set of offenses.[4]   The victims trusted the Petitioner because she had previously worked with them in purchasing real estate or in financing the purchases.

Petitioner's many theft convictions resulted from Petitioner's taking money from individuals under false representations that it would be a down payment on a house, a contribution to a real estate investment, a mortgage payment, or a payment for a change of title, when in fact Petitioner did not apply the funds to the anticipated transactions.  Petitioner often took cash or money orders from the victims without issuing a receipt or logging the amount in a real estate trust account log; often Petitioner would then write and sign her daughter's name on checks on her daughter's bank account to be used for the particular transaction.  After the passage of time, the

---

[4] The victims include Mercedes Padilla, Leticia Contreras, Sonia Mendes, Maria Goulart, Margarito Revelas, Martina Luna, Antonia Salazar, Iris Caballero, Maricella Quinones, Consuelo Ortega, Jaimie and Enriquietta Barrajas, Gloria Salazar, Josephina Caballero, Celerina Ramos, Steven Romanazzi, Reina Hernandez, and Luis Gutierrez.

checks would be returned for insufficient funds.  In most cases, the victims' money disappeared, although partial restitution was made in several instances.  The theory of the burglaries was that Petitioner entered the victims' homes intending to take their money for her own use.  The forgery convictions were from Petitioner's signing her daughter's name to checks that were issued on her daughter's accounts.

B. <u>Facts</u>

In a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness.  28 U.S.C. § 2254(e)(1); <u>Sanders v. Lamarque</u>, 357 F.3d 943, 947-48 (9th Cir. 2004).  This presumption applies to a statement of facts drawn from a state appellate court's decision.  <u>Moses v. Payne</u>, 555 F.3d 742, 746 n.1 (9th Cir. 2009).

The following summary of the evidence is based on the facts stated in the opinion of the CCA in <u>People v. Mary Odilia Rodrigues</u>, case number F047893, filed on February 28, 2007, in which the CCA addressed the sufficiency of the evidence to support some of Petitioner's many convictions.[5]

---

[5] The court notes that in the reply, Respondent summarizes the facts of Petitioner's many offenses with citations to the trial record.

In addition to the testimony given by the victims regarding each set of offenses, there was extensive testimony showing that in her dealing with the victims, Petitioner violated the norms of the real estate profession as well as the rules of the Department of Real Estate (DRE).  The testimony was given by 1) Lino Pimentel, a real estate agent who had been Petitioner's manager and then a co-salesperson with Petitioner after sale of Pimentel's firm in 1999, and 2) Andre Rocha, a real estate broker who later managed a firm where Petitioner worked under his supervision until January 31, 2002.  (LD 2, 2-6.)

Rocha and Pimentel established that the regular procedure for taking from a prospective purchaser money intended to be used as a down payment was to enter the deposit in the office's trust account log, and not to put a client's money in the agent's own account, which is not permitted because it would violate DRE rules; cash was not preferred, but if received it would be photocopied, a copy placed in the file, and the file placed in a locked cabinet.  (LD 2, 2-6.)  Pimentel testified that it was abnormal for a buyer to give a real estate agent a deposit before finding a home the buyer wished to make on offer on, or to make a money order deposit payable to the real estate agent.  (Id. at 2-3.)  Rocha testified that it was illegal for a sales agent to write a personal check for a client for

Respondent's summary is essentially unchallenged and unrebutted by Petitioner.  (Doc. 16, Doc. 26.)

a down payment because it would constitute commingling of funds;
commingling of funds received from a buyer with an agent's own
money, or depositing such funds into an agent's bank account, was
prohibited.   (<u>Id.</u> at 4-6.)

If an offer on a property is rejected, then the deposit is
returned to the buyer or kept for a future transaction if the buyer
gives permission in writing to keep the money on file for a future
offer.  (LD 2, 2-3, 5.)  Rocha testified that files belong to the
real estate company once a purchase agreement or listing agreement
is signed.  When a house is sold, it is the seller, and not the
buyer, who pays the commission to the agent and real estate company.
(<u>Id.</u> at 4-6.)

Pimentel testified that it violated DRE rules for a real estate
agent to assist, or to collect a fee for assisting, clients in
refinancing their property, or to charge them to prequalify for a
loan, show them houses, or help them add or remove a name on a title
document.  (<u>Id.</u> at 3.)

Rocha testified that a sales agent can only perform real estate
functions when his or her license is with a broker; a sales agent
without a license with a broker can refer someone to a real estate
agent but cannot collect a fee, assist the agent with any
transaction that requires a license, show clients property, solicit
business, retain any fees, sign any contracts, collect down

payments, or share in commissions.  An agent could give a gift not exceeding $50 in value to someone for a referral.  (Id. at 5.)

Rocha testified that around Christmas 2001, he received a telephone call from a client of Petitioner, which resulted in Rocha's speaking to Petitioner about not commingling funds, a violation of DRE rules.  Petitioner told Rocha she would take care of the problem.  Rocha asked Petitioner to complete her open escrows and informed her that he would terminate Petitioner at the end of January; Petitioner agreed to complete open transactions and not open any new ones.  When Petitioner's association with the firm ended on January 31, 2002, there was no money in the office trust account attached to any of Petitioner's files, and only one file remained open, which related to a home for which Pimentel was the listing agent.  (Id. at 4.)  After Petitioner left the firm toward the end of 2001, Pimentel received telephone calls from clients concerning money that apparently had nothing to do with deposits and things of that nature.

The evidence included Pimentel's testimony that when he met with Petitioner, Petitioner admitted to him that she had taken approximately $67,000 from her clients, but she was going to repay it.  (Id. at 4.)

Petitioner testified that she received her real estate license in 1991 and worked as a real estate agent until January 2002.  She admitted taking "good faith money" in the form of money orders

toward obtaining a credit report from her clients; she left the money orders blank and put them in office file or, towards the end of her career, filled in the orders with her own name.  Although she testified she logged her clients' escrow deposits into the trust account, she admitted that some clients' names did not appear in the trust account log; she explained that the log was not the "original" one.  She admitted that she met with Pimentel after she left the office to discuss files transferred to him, but she claimed that he agreed to pay her a twenty per cent referral fees for buyers or persons wishing to refinance their homes.  (Id. at 6-7.)

Petitioner admitted writing checks involved in most transactions on her daughter's account and signing them in her daughter's name, but she testified she had her daughter's permission to do so.  Petitioner also wrote checks on another checking account for a business, CMR Enterprises (CMR), that was opened in the names of Petitioner's daughter and mother, even though Petitioner was not on the signature card; Petitioner signed her daughter's name. Petitioner had closed her own bank account in 1998 when she divorced.  Petitioner's daughter testified that Petitioner had her permission to write checks on the accounts and to sign her name. (Id. at 7.)  Petitioner claimed that the bank manager knew that she was signing her daughter's name, and Petitioner claimed that she deposited $15,000 in her daughter's account in May 2002, but the bank's statements had "mistakes," and were not the proper

11

statements.  (Id.)

Petitioner denied having written checks on her daughter's account when the account had insufficient funds, and she denied that any checks had been returned for insufficient funds.  However, Petitioner also testified that if a check had insufficient funds, she would receive notification from the bank and would deposit money to cover the check.  Petitioner testified that she had received about five calls between January 2001 and January 2002 advising her that her daughter's account had insufficient funds.

Jerry Sell, the branch manager of the bank where Petitioner's daughter had her personal account, testified that as a courtesy the bank would call to warn an account holder (in this case, Petitioner's daughter) if there were insufficient funds to cover a check written on the account and thereby to give the person a chance to come in to make a deposit to cover the amount.  Sell testified that the bank would not have permitted Petitioner to sign her daughter's names to checks because the daughter was the only one on the signature card; regardless of her daughter's permission, it would be forgery.  Bank statements for Petitioner's daughter's account showed a number of "check returned" entries, which meant that the checks had not cleared due to insufficient funds; when the account was closed by the bank in May 2002, there was a negative balance of $832.22 because of insufficient fund checks being written and charges owed to the bank.  (Id. at 7-8.)

Petitioner testified she was also an agent for U.S. Mortgage, a "reduction company" that allowed homeowners to make mortgage payments every two weeks to accelerate the reduction of their overall debt; Petitioner offered the program to clients to whom she had previously sold homes, helping an average of ten clients per month with their mortgage payments.  (Id. at 6.)

IV.  Timeliness of the Petition

The AEDPA provides a one-year period of limitation in which a petitioner must file a petition for writ of habeas corpus.  28 U.S.C. § 2244(d)(1).  As amended, subdivision (d) reads:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively appicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with

13

respect to the pertinent judgment or claim is pending
shall not be counted toward any period of limitation
under this subsection.

28 U.S.C. § 2244(d).

### A.   The Running of the Limitations Period

Under § 2244(d)(1)(A), the "judgment" refers to the sentence
imposed on the petitioner.  Burton v. Stewart, 549 U.S. 147, 156-57
(2007).   The last sentence was imposed on Petitioner on April 26,
2005.  (LD 1.)

Under § 2244(d)(1)(A), a judgment becomes final either upon the
conclusion of direct review or the expiration of the time for
seeking such review in the highest court from which review could be
sought.  Wixom v. Washington, 264 F.3d 894, 897 (9th Cir. 2001).
The statute commences to run pursuant to § 2244(d)(1)(A) upon either
1) the conclusion of all direct criminal appeals in the state court
system, followed by either the completion of denial of certiorari
proceedings before the United States Supreme Court; or 2) if
certiorari was not sought, then by the conclusion of all direct
criminal appeals in the state court system followed by the
expiration of the time permitted for filing a petition for writ of
certiorari.  Wixom, 264 F.3d at 897 (quoting Smith v. Bowersox, 159
F.3d 345, 348 (8th Cir. 1998), cert. denied, 525 U.S. 1187 (1999)).

Here, neither party has indicated that Petitioner sought
certiorari from the United States Supreme Court.  Indeed, it is
undisputed that Petitioner did not even file a petition for review
in the CSC.  The last state court decision in the course of direct
appeal, namely, the CCA's decision of February 28, 2007 (LD 2), was

14

final pursuant to state law forty days later on April 9, 2007.[6]   The

Supreme Court has held that where a petitioner did not seek review

by the state's highest court, the petitioner's judgment becomes

final when the time for pursuing direct review in state court

expires:

> We now make clear what we suggested in those cases:
> The text of § 2244(d)(1)(A), which marks finality
> as of "the conclusion of direct review or the
> expiration of the time for seeking such review,"
> consists of two prongs. Each prong—the "conclusion
> of direct review" and the "expiration of the time
> for seeking such review"—relates to a distinct category
> of petitioners. For petitioners who pursue direct review
> all the way to this Court, the judgment becomes final
> at the "conclusion of direct review"—when this Court
> affirms a conviction on the merits or denies a petition
> for certiorari. For all other petitioners, the judgment
> becomes final at the "expiration of the time for seeking
> such review"—when the time for pursuing direct review in
> this Court, or in state court, expires. We thus agree
> with the Court of Appeals that because [the petitioner]
> did not appeal to the State's highest court,
> his judgment became final when his time for
> seeking review with the State's highest court expired.

Gonzalez v. Thaler, - U.S. -, 132 S.Ct. 641, 653-54 (2012).

Thus, Petitioner's judgment became final within the meaning of

§ 2244(d)(1)(A) on April 9, 2007, when the time for seeking review

from the CSC expired.

The Court will apply Fed. R. Civ. P. 6(a) in calculating the

pertinent time periods.  See, Waldrip v. Hall, 548 F.3d 729, 735 n.2

(9th Cir. 2008), cert. denied, 130 S.Ct. 2415 (2010).  Applying Fed.

---

[6] Pursuant to Cal. Rules of Court, Rule 8.500(e), a petition for review "must be served and filed within 10 days after the Court of Appeal decision is final in that court."  Pursuant to Cal. Rules of Court, Rule 8.366(b), a Court of Appeal's decision in a criminal appeal "is final in that court 30 days after filing."

R. Civ. P. 6(a)(1)(A), the day of the triggering event is excluded from the calculation.  Thus, the one-year limitations period commenced on April 10, 2007, the first day following the expiration of the time in which direct state review could have been sought. Further applying Rule 6(a)(1)(A), which requires counting every day, the one-year period concluded one year later on April 9, 2008.

Because Petitioner's federal petition was not filed until July 31, 2013, the petition was untimely unless the running of the statute was tolled or there is an applicable exception to the statute of limitations.

    B.   <u>Statutory Tolling</u>

        1.   <u>Pendency of State Court Petitions for Collateral Relief</u>

Title 28 U.S.C. § 2244(d)(2) states that the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward" the one-year limitation period. 28 U.S.C. § 2244(d)(2).

An application for collateral review is "pending" in state court "as long as the ordinary state collateral review process is 'in continuance'- <u>i.e.</u>, 'until the completion of' that process." <u>Carey v. Saffold</u>, 536 U.S. 214, 219-20 (2002).  In California, this generally means that the statute of limitations is tolled from the time the first state habeas petition is filed until the California Supreme Court rejects the petitioner's final collateral challenge, as long as the petitioner did not "unreasonably delay" in seeking review.  <u>Id.</u> at 221-23; <u>accord</u>, <u>Nino v. Galaza</u>, 183 F.3d 1003, 1006

(9th Cir. 1999).

The statute of limitations is not tolled from the time a final decision is issued on direct state appeal and the time the first state collateral challenge is filed because there is no case "pending" during that interval.  Nino v. Galaza, 183 F.3d at 1006; see, Lawrence v. Florida, 549 U.S. 327, 330-33 (2007) (holding that the time period after a state court's denial of state post-conviction relief and while a petition for certiorari is pending in the United States Supreme Court is not tolled because no application for state post-conviction or other state collateral review is pending).

Here, the first state habeas petition was not filed until January 2011, long after the expiration of the limitations period in April 2008.  Thus, Petitioner's state court petitions did not toll the running of the statute pursuant to § 2244(d)(2).  Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir. 2003).

2.   Discovery of Factual Predicate of Claims

Petitioner argues that the statute was tolled until she discovered new evidence of misconduct on the part of bank manager Jeri Sell, who testified at Petitioner's trial.  Petitioner alleges that Sell improperly closed her daughter's account, embezzled money, and falsified documentation of bank history.  (Pet., doc. 1, 14; opp., doc. 20, 7-8.)  Petitioner alleges that there was a conspiracy among real estate broker Rocha, whom Petitioner asserts she angered;

17

broker Pimentel; and Sell, the embezzling bank manager, who framed Petitioner for crimes she did not commit. (Doc. 1, 31-32.) Petitioner alleges that Pimentel and Rocha falsified real estate trust logbook records and misappropriated customer's money orders that Petitioner had turned over. (Id. at 34.) Although Petitioner appears to admit that she has no proof that Sell had committed any misconduct with respect to Petitioner's own bank records, she asserts that "manipulating the data which feeds those accounts would surely have been within her purview." (Id. at 145.) Petitioner asserts on the basis of newspaper articles and unidentified sources that Sell suffered a misdemeanor theft conviction in 1992 and that Sell's thefts at the bank may have commenced as early as 2001. (Id. at 112, 125, 147-48.)

Petitioner admits that she raised these points concerning Sell during Petitioner's trial and at a hearing on a motion to substitute counsel in 2005 after her verdict but before sentencing. (Pet., doc. 1, 14, 30-32.) Petitioner argued at trial that something was wrong with her bank statements; they were tampered with and were not hers, and she had made payments to people that had shown up on her altered statements as insufficient funds. (Id. at 15.) Sell was convicted in 2011 of having embezzled $650,000 and having forged and altered bank statements of clients who were also her friends. (Id.) Petitioner argues that at the time Sell was convicted on June 20, 2011, Petitioner received corroboration of what she had asserted in

the trial court, and that the statute of limitations should begin running anew at that time.  (Doc. 20 at 5, 9.)

Title 28 U.S.C. § 2244(d)(1)(D) provides in pertinent part that the "limitation period shall run from the latest of... the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  Under § 2244(d)(1)(D), the statute of limitations begins to run when the factual predicate of a claim "could have been discovered through the exercise of due diligence," not when it actually was discovered.  28 U.S.C. § 2244(d)(1)(D); Ford v. Gonzalez, 683 F.3d 1230, 1235 (9th Cir. 2012).  The diligence required is not maximum feasible diligence, but rather reasonable diligence in the circumstances. Id.  Although due diligence is measured by an objective standard, a court will also consider the petitioner's particular circumstances, including both impediments and resources that would affect discovery of the facts, such as physical confinement, familial assistance, and any representations made by the government.  Id. at 1235-36.  A later accrual date results only if vital facts could not have been known by the date the appellate process ended; however, when a person knows or through reasonable diligence could discover the vital facts, the time starts running regardless of when the legal significance of the facts is actually discovered.  Id. at 1235.

A habeas petitioner has the burden to prove that he or she exercised due diligence in discovering the factual predicate for his

or her claim in order for the statute of limitations to begin

running from the date he or she discovered the factual predicate of

the claim.  Ford v. Gonzalez, 683 F.3d at 1235; Majoy v. Roe, 296

F.3d 770, 777 n.3 (9th Cir. 2002).  The triggering date under

§ 2244(d) is analyzed with respect to each claim individually.

Mardesich v. Cate, 668 F.3d 1164, 1169-71 (9th Cir. 2012).

Here, Sell's misconduct or convictions were not predicates to

any claim in the petition before the Court.  As is demonstrated by

the discussion of the actual innocence exception to the statute of

limitations that is set forth later in this order, Sell's testimony

served mainly to explain bank policies and procedures.  Petitioner's

commission of thefts, burglaries, and check-related offenses was

demonstrated not by the balance of deposits or the status of any

given check drawn on Petitioner's daughter's account, but rather by

Petitioner's admittedly taking thousands of dollars from her many

victims under circumstances strongly warranting a conclusion that

Petitioner did so with wrongful intent, including misrepresentations

as to the use to which the funds were to be put and failure to

perform the promised tasks or transactions; disregard of rules,

formalities, and record-keeping procedures designed to protect the

client; inability to offer any credible explanation, separate from

her own conduct, for the disappearance of the funds; and evasiveness

when victims attempted to seek the return of their funds.

In addition to Petitioner's own conduct, there was substantial

documentation of Petitioner's misappropriation of the funds that was not shown to have been affected by or involved in Sell's unrelated misconduct that occurred several years later.  Petitioner challenged all the records that reflected her appropriation of funds through improper methods, including money grams, real estate trust account logs, and bank statements.  However, the records emanated from separate sources and underwent discrete and unrelated processes. The absence of trust log entries for the funds given to Petitioner by the victims, the use of money orders or money grams in blank, the appearance of Petitioner's name and signature on executed/cashed money orders and money grams, and the writing of bad checks on the daughter's account to facilitate gaining control of the victims' funds all consistently manifested Petitioner's thefts.  Sell's having embezzled the funds and manipulated the records of other people several years later did not constitute a defense to theft or a basis for a claim that would have entitled Petitioner to relief from her convictions.

Further, the theory that the bank had done something wrong, and specifically that Sell had embezzled money from the accounts used by Petitioner in May 2002, had been known to Petitioner at trial and had been raised during a motion to substitute counsel.  (Doc. 1, 221-37.)

Even if Sell's subsequent conviction of June 20, 2011 (doc. 20, 5-6, 9) were considered to be additional evidence that supported

Petitioner's theory of defense but was unavailable at trial, the petition filed in the instant action is nevertheless untimely because Petitioner was not diligent in seeking relief.  Petitioner indicates that in April 2010, her daughter read in a newspaper article that Sell was being investigated by police and was being charged with embezzling money from banking customers.  (Doc. 1, 123, 253.)  However, Petitioner waited until July 31, 2011 to present her claim of innocence to the TCSC.  (LD 3, form p. 6.)  Even if Sell's conviction in 2011 were considered to be the triggering date, Petitioner failed to exercise diligence thereafter because after the CSC denied her last state court petition on June 27, 2012, Petitioner waited thirteen months until she constructively filed the petition here on July 31, 2013.  (LD 11; doc. 1, 6.)

In summary, Petitioner's unjustified delay precludes reliance on § 2244(d)(1)(D).

C.  Equitable Tolling

Petitioner argues that she is entitled to equitable tolling of the statute of limitations for extraordinary circumstances including 1) her trial counsel had a conflict of interest that prejudicially affected his representation and constituted a fundamental miscarriage of justice (doc. 1, 12-13); 2) her appointed appellate counsel (Miggins) was ineffective and caused delay (id. at 19); 3) her retained counsel on a habeas matter (Richardson) did not file a

brief or notify her of the disposition of her appeal,[7] which Petitioner alleges that she learned of in May 2010 after his death (id. at 19-23); and 4) lockdowns and limited law library access prevented her from filing a timely petition (doc. 20 p. 13).

The one-year limitation period of § 2244 is subject to equitable tolling where the petitioner shows that he or she has been diligent, and extraordinary circumstances have prevented the petitioner from filing a timely petition.  Holland v. Florida, – U.S. –, 130 S.Ct. 2549, 2560, 2562 (2010).  Petitioner bears the burden of showing the requisite extraordinary circumstances and diligence.  Chaffer v. Prosper, 592 F.3d 1046, 1048 (9th Cir. 2010).  A petitioner must provide specific facts regarding what was done to pursue the petitioner's claims to demonstrate that equitable tolling is warranted.  Roy v. Lampert, 465 F.3d 964, 973 (9th Cir. 2006).  Conclusional allegations are generally inadequate.  Williams v. Dexter, 649 F.Supp.2d 1055, 1061-62 (C.D.Cal. 2009).

The petitioner must show that the extraordinary circumstances were the cause of his untimeliness and that the extraordinary circumstances made it impossible to file a petition on time.  Ramirez v. Yates, 571 F.3d 993, 997 (9th Cir. 2009).  Where a prisoner fails to show any causal connection between the grounds for equitable tolling and the inability to file a timely federal habeas application, the equitable tolling claim will be denied.  Gaston v. Palmer, 417 F.3d 1030, 1034-35 (9th Cir. 2005).

The diligence required for equitable tolling is reasonable

---

[7] The CCA's opinion on appeal dated February 28, 2007, named Richard D. Miggins as Petitioner's appointed appellate counsel.  (LD 2, 1.)

diligence, not "maximum feasible diligence." Holland v. Florida,

130 S.Ct. at 2565.  However, "the threshold necessary to trigger

equitable tolling [under AEDPA] is very high, lest the exceptions

swallow the rule." Spitsyn v. Moore, 345 F.3d 796, 799 (9th Cir.

2003) (quoting Miranda v. Castro, 292 F.3d 1063, 1066 (9th Cir.

2002)).  A petitioner seeking equitable tolling must demonstrate

reasonable diligence while exhausting state court remedies as well

as while attempting to file a federal petition during the period

after the extraordinary circumstances began. Roy v. Lampert, 465

F.3d 964, 971 (9th Cir. 2006).  The effort required is what a

reasonable person might be expected to deliver under his or her

particular circumstances. Doe v. Busby, 661 F.3d 1001, 1015 (9th

Cir. 2011).  Because a pro se petitioner's habeas filings must be

construed with deference, a court will construe liberally such a

petitioner's allegations regarding diligence. Roy v. Lampert, 465

F.3d at 970.

     Here, Petitioner's allegations concerning trial counsel are

general and do not establish any conflict of interest.  Further,

Petitioner has not shown how any alleged problem with trial counsel

constituted an extraordinary circumstance or contributed to the

untimely filing of the petition.

     With respect to appellate attorney Richardson, the docket

entries for the briefs in Petitioner's appeal in the CCA reflect

that although appointed appellate counsel Richard Miggins filed the

opening brief in October 2005, attorney Thomas J. Richardson was

substituted in as counsel of record in January 2006; the reply brief

was due in July 2006, but no reply brief was filed, although

Richardson later waived argument on behalf of Petitioner.[8]  The CCA's opinion on appeal dated February 28, 2007, named Richard D. Miggins as Petitioner's appointed appellate counsel.  (LD 2, 1.)

Petitioner alleges that she did not know until February 2, 2010, that Richardson had died on April 21, 2009; she did not know of the status of her appeal until she learned through attorney Nunes in May 2010.  (Pet., doc. 1, hand numbered pp. 13, 19-22.)  It appears from the CCA's docket that attorney Nunez requested a copy of the case folder on Petitioner's behalf in December 2010. Petitioner continued to correspond with the appellate court from the middle through the end of 2011, when the clerk of the appellate court stated in correspondence with Petitioner that her appeal was not pending, and if she wished to appeal from the TCSC's habeas ruling, which was not an appealable order, Petitioner would have to raise her claims before the CCA in a habeas petition.  Petitioner alleges that she never obtained her files from her deceased counsel, and she did not receive a new copy of her transcripts until around August 2011.  (Id. at 16.)

Petitioner alleges that she was diligent because she filed her TCSC habeas petition in August 2011, only four months after Sell pled guilty to embezzlement in May 2011; when her TCSC habeas was denied on October 24, 2011, Petitioner had been sent a copy of her

---

[8] The Court takes judicial notice of the docket in People v. Rodrigues, CCA case number F047893.  The Court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, including undisputed information posted on official websites.  Fed. R. Evid. 201(b); United States v. Bernal-Obeso, 989 F.2d 331, 333 (9th Cir. 1993); Daniels-Hall v. National Education Association, 629 F.3d 992, 999 (9th Cir. 2010).  It is appropriate to take judicial notice of the docket sheet of a California court.  White v Martel, 601 F.3d 882, 885 (9th Cir. 2010), cert. denied, 131 S.Ct. 332 (2010).  The address of the official website of the California state courts is www.courts.ca.gov.

trial record (pet., doc. 1, 251), and she filed a petition in the CCA in January 2012, and upon its denial in March 2012, she filed a petition in the CSC in April 2012.  When the CSC denied her petition (June 27, 2012), Petitioner sought pro bono assistance from a new jailhouse lawyer in June 2013, which resulted in the preparation of the federal petition she filed in the instant case on July 31, 2013. (Doc. 1, 22-30.)

However, Petitioner also admits that it was at trial and during a hearing to discharge her counsel in 2005 after verdict and before sentence that she made her allegations regarding a conspiracy involving Sell, Rocha, and Pimentel, who falsified records and misappropriated money orders that Petitioner turned over to the brokerage.  (Id. at 31-34.)

It is not clear at what stage Petitioner's retained counsel fully abandoned her on appeal; although he did not file a reply brief, he did waive argument.  However, Petitioner alleges that he did not notify her that the appeal had been decided in 2007, and no petition for review before the CSC was filed.  Nevertheless, even assuming that Richardson engaged in conduct amounting to abandonment or other misconduct sufficiently severe and unusual to constitute extraordinary circumstances, and even if it were further assumed that it was reasonable and consistent with diligence for Petitioner to believe that her appeal was pending before the CCA for five years, there is no apparent causal connection between any delay in the direct appeal process, wherein Petitioner had raised issues of the sufficiency of the evidence and state law sentencing calculations, and the filing of the present petition, wherein Petitioner argues that her trial counsel was ineffective throughout

the investigation and presentation of the case at trial, including his failure to present evidence of Sell's misconduct. (Doc. 1, 1-34.)

With respect to the impact of Petitioner's prison conditions on her ability to file a timely petition, Petitioner alleges that the pertinent filing periods coincided with the conversion of her institution of confinement into a prison for men and with practically no access to the law library due to lockdowns. (Doc. 20, 13.)

Petitioner was housed at Valley State Prison for Women (VSPW) when the CSC denied her final state habeas petition on June 27, 2012. She remained there until December 13, 2012, when she was transferred to California Central Women's Facility (CCWF). (LD 11, LD 16.) Respondent submitted a correctional news publication and a program status report made for the state of California that show that VSPW was converted to a men's institution during the period between October 11, 2012, and January 16, 2013. (LD 14, LD 17.) Although Petitioner may have been affected by conditions during the active period of conversion from mid-October until her transfer on December 13, 2012, it appears that this period extended for only about two months. However, Petitioner waited over another seven months after her transfer to file her federal petition on July 31, 2013. (LD 16; doc. 1.)

Prison documents show that throughout the period of conversion experienced by Petitioner before her transfer, there were three days of lockdowns. (LD 17.) Further, from July 2011 through Petitioner's transfer in December 2012, Petitioner was assigned to work in the library as a janitor. (LD 18.) Time logs of her

27

supervisor show that Petitioner generally worked five days for up to
seven hours a day in the summer of 2012; during the conversion, she
worked five days for almost eight hours each between October 11 and
October 31, 2012; eight days, for a total of over fifty hours, in
November 2012; and four days for a total of twenty-seven hours
between December 1, 2012, and her transfer on December 13, 2012. (LD
19.)  The senior law librarian from former VSPW declares that non-
inmate law library staff members were unable to keep their inmate
janitorial staff busy during shifts; it was not uncommon to permit
the inmates to work on their own legal cases.  (LD 20.)

     The specific facts of Petitioner's conditions of confinement
and the inferences reasonably drawn therefrom are inconsistent with
Petitioner's generalized assertions of extraordinary limitations on
library access due to lockdowns or programming.  Some limitations on
law library access are to be expected as a normal condition of
prison life; thus, limitations on law library access and research
materials are generally not considered extraordinary circumstances
that make it impossible to file a timely petition or otherwise
warrant equitable tolling.  Chaffer v. Prosper, 592 U.S. at 1049;
Ramirez v. Yates, 571 F.3d at 998.  Petitioner has not established
that any specific limitation on access or materials caused her to be
unable to file a timely petition.

     It appears that Petitioner did not have access to her state
court record or transcripts until August 2011.  In some
circumstances, lack of access to legal files can constitute an
external impediment sufficiently extraordinary to support equitable
tolling.  Chaffer v. Prosper, 592 F.3d at 1049.  However, it is
necessary for a petitioner to demonstrate her own diligence and that

the lack of access was the extraordinary circumstance that caused the petition to be filed as late as it was.  Id.  This means that a petitioner must point to specific instances in which she was unable to file a timely federal petition because of the lack of access to a particular document.  Id.  Here, however, Petitioner's allegations are general, and Petitioner does not explain how this lack of access prevented a timely federal petition from being filed in 2012 and 2013.  Petitioner does not show how the specific absence of the state court record prevented her from filing a timely petition claiming entitlement to relief because of allegations of misconduct of the bank officer.

Further, the Court notes that Petitioner was able to file several petitions during the years when she worked as a janitor in the law library both before and during the time she had access to the state court record.

In summary, the Court concludes that Petitioner has failed to show how any extraordinary circumstance caused her to be unable to file a timely federal petition.  Thus, Petitioner's claim of equitable tolling should be rejected.

> D.  Actual Innocence

Petitioner argues that she is actually innocent based on what she characterizes as evidence of Sell's misconduct in closing her daughter's account, embezzling money, and falsifying bank records. (Doc. 1, 13-14, 31.)

In McQuiggin v. Perkins, 569 U.S. –, 133 S.Ct. 1924, 1931-34 (2013), the Court held that a petitioner who had not shown extraordinary circumstances and reasonable diligence to warrant

equitable tolling could nevertheless attempt to qualify for an equitable exception to the statute of limitations set forth in 28 U.S.C. § 2244(d) based on actual innocence as a form of miscarriage of justice.  A petitioner does not meet the threshold requirement of showing actual innocence as an equitable exception to the statute of limitations unless she persuades the district court that new evidence shows that it is more likely than not that no reasonable juror would have convicted the petitioner, that is, no juror, acting reasonably, would have voted to find her guilty beyond a reasonable doubt.  Id.  at 1935.  The gateway should open only when a petitioner presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error.  Id. at 1936.  This is consistent with the rationale underlying the miscarriage of justice exception, namely, ensuring that federal constitutional errors do not result in the incarceration of innocent persons.  Id.

     The timing of the petition is a factor bearing on the reliability of the evidence purporting to show actual innocence. Id. at 1934-36.  Where a federal habeas court is faced with a claim of actual innocence as a gateway, unjustifiable delay does not absolutely bar relief, but rather is a factor in determining whether the petitioner has made the requisite showing of actual innocence. A court may consider how the timing of the submission and the likely credibility of a petitioner's affiants bear on the probable

reliability of the evidence of actual innocence.  <u>Id.</u>

Here, it does not appear that Sell engaged in any misconduct with respect to Petitioner's account.  Sell was charged in 2010 with having stolen some customers' night deposits and having taken funds from some customers' large cash deposits starting around 2005, and she pled no contest to some of the charges.  (LD 2, 2; LD 4, 2.)  There is no indication that Sell's convictions related to Petitioner's daughter's account, or to Petitioner's misconduct in 2002.  Even if it is accepted that Sell was dishonest with respect to some banking transactions and records, there is no basis for an inference that any record of any transaction concerning any account involved in Petitioner's misconduct was inaccurate or falsified.

Further, Sell's testimony at trial did not provide a basis for an inference that Sell had participated in receiving deposits or making records of events in Petitioner's banking history.  Sell testified that as the vice-president and branch manager from July 2001 through June 2002, she reviewed the daily records of deposits and checks on each account; the records had been prepared by third parties on a daily transaction record, not a bank account statement.  (RT 1105-09.)  Sell testified that a check with insufficient funds would be returned unless an account holder deposited the needed amount by 10:30 a.m. after a telephone call from the bank notifying the account holder of the insufficiency.  However, Sell was not the bank employee who made the calls.  (<u>Id.</u> at 1106-08.)

31

1    Sell confirmed from bank records that Petitioner's account had

2    been closed for a negative balance due to insufficient funds and

3    bank charges on May 29, 2002, but Sell needed more records to

4    determine exactly how the negative balance was reached.  She also

5    explained that checks sent to the bank were first logged as a

6    deposit or addition; then, when during further processing it

7    appeared that there were insufficient funds to cover the check, the

8    amount was deducted.  Thus, amounts that appeared in a bank

9    statement to be deposits at one point might ultimately not result in

10   any addition to the amount actually on deposit.  (RT 1115-31, 1148.)

11

12

13        Petitioner was convicted of theft and burglary from the victims

14   on the basis of her own conduct and wrongful intent, and not because

15   of a series of bank transactions.  Thus, it is not patently logical

16   that Sell's distant and apparently unrelated misconduct provided a

17   defense.  Further, as the TCSC ruled in denying Petitioner's habeas

18   petition, attempting to write checks to cover earlier

19   misappropriations could not constitute a defense to theft under

20   state law.  (LD 4, 3.)  The jury was instructed as follows:

21

22        It is not a defense to prosecution for theft that after
          the theft was committed completed or (sic) partial restitution
23        or offer of restitution was made to the owner of the stolen
          property or that his or her loss was wholly or partly
24        recovered by any other means.

25

26   (RT 1389.)  In a proceeding pursuant to § 2254, this Court accepts a

27   state court's interpretation of state law.  Langford v. Day, 110

28   F.3d 1180, 1389 (9th Cir. 1996).  Thus, evidence concerning Sell's

misconduct could not have constituted a defense or otherwise rendered Petitioner actually innocent of the theft offenses.

The nature and extent of the evidence of Petitioner's guilt that was before the trier of fact also precludes a showing of actual innocence.  The record is replete with evidence of Petitioner's wrongful intent to deprive others of their property.  Petitioner admitted that she had taken funds but maintained that she was going to repay them despite a total absence of any resources with which to make payment.  Further, she admitted to several people that she no longer had sufficient funds to restore the amounts taken from the victims; this in turn warranted an inference that she had commingled and misappropriated the victims' funds.

Petitioner repeatedly engaged in conduct that showed her consciousness of guilt.  She told a victim to call her if there was any problem with checks given to her by Petitioner.  (Ramos [RT 979].)  Petitioner asked a victim to refrain from cashing a check Petitioner had delivered and then had the check destroyed. (Contreras [LD 2, 11-12].)  In several instances, Petitioner admitted she did not have the victim's payment or was in some "trouble," set up a meeting to repay it, and then did not appear at the meeting and could not be contacted.  (Sonia Mendes [LD 2, 14; RT 238-39], Goulart [RT 440-45, LD 2, 16], Ramos [RT 980].) Petitioner repeatedly promised to return money or give another check but never did, and then became impossible to contact.  (Iris

33

Caballero [LD 2, 20; RT 475-76], Barrajas [RT 346-47, 358-59], Josephina Caballero [RT 387-90, 398-99], Romanazzi [RT 518-22, 531-34, 536-38, 544-45].)  Petitioner told one victim that she was having trouble selling her own home and would contact the victim to pay later, and then gave the victim's wife a check drawn on Petitioner's daughter's account long after the account had been closed.  (Romanazzi [RT 527-28, 533, 537-44, 547-48].)  Numerous victims who tried to get their money back found that Petitioner, who previously had been present and accessible, disconnected her communications devices and/or became impossible to contact. (Revelas [LD 2, 17], Ortega [RT 741, 757-58], Gloria Salazar [RT 268-29, 275-76, 284, 290, 295, 309-10], Ramos [RT 994-95], Hernandez [RT 650-51, 662-66], Gutierrez [RT 590-91].)  In February 2002, Petitioner falsely told one victim, Gloria Salazar, that Petitioner was working at Century 21.  (RT 269.)

Petitioner did not provide any documentation or other evidence in support of her challenges in the trial court to the accuracy of data on money gram copies, the real estate office's trust account records, or the bank's statements.  It was within the province of the trier of fact to assign greater reliability to the challenged records, including the bank statements and records, than to Petitioner's testimony.  Considering all the evidence, no showing of actual innocence can successfully be predicated upon the isolated phenomenon of the amount and sufficiency of the funds in

Petitioner's daughter's bank accounts in May 2002 or throughout the pertinent time.  This is because in many respects, Petitioner's methods of doing business were blatantly contrary to DRE rules or real estate office practices that function to protect the client. This pervasive misconduct evinced wrongful intent and warranted inferences that Petitioner intended to conceal the transactions, her conduct, and/or an improper motive, in order to obtain and maintain control over the funds she received, to put the funds to her own use, to gain an advantage over the victims with respect to the property they conveyed and entrusted to her, and to abuse the trust placed in her by persons who were much less educated about real estate transfers and finance than Petitioner.  Examples abound, including taking instruments made out to Petitioner personally (Sonia Mendes [LD 2, 13; RT 9-11, 42-44]), representing that Petitioner would apply to a particular payee and transaction a money order or money gram that was blank as to the payee, but being unable to explain how Petitioner's name apparently was later inserted as payee and her signature used to negotiate the instrument (Padilla [LD 2,3], Goulart [LD 2, 15], Quinones [RT 617-20, 633-35; LD 2, 21]); taking money for transactions, such as effectuating title changes or showing properties to clients, which she lacked the authority to undertake or to receive compensation for performing (Antonia Salazar [LD 2, 19], Ortega [RT 730-37, 746, 749, 755-57], Gloria Salazar [RT 264], Hernandez [RT 643-48, 650, 654-56, 660-61],

Gutierrez [RT 567-70]); failing to log clients' deposits and payments in the trust account and commingling clients' deposits and payments with her own funds (Sonia Mendes [LD 2, 13; RT 9-11, 42-22]); taking instruments with the payee left blank (Contreras [RT 216, 218, 221], Luna [LD 2, 17-18]); and failing to complete paperwork (Hernandez [RT 644, 648-50]) or to give clients receipts, copies, or complete copies of contracts and other paperwork (Contreras [LD 2, 11-12], Sonia Mendes [LD 2, 13], Goulart [LD 2, 15], Josephina Caballero [RT 381], Ramos [RT 987]).

In light of the evidence in the record, it cannot be concluded that the allegedly "new" evidence concerning Sell's convictions shows that it is more likely than not that no reasonable juror would have convicted the petitioner, that is, no juror, acting reasonably, would have voted to find her guilty beyond a reasonable doubt.

Accordingly, the Court concludes that Petitioner has not shown that she is actually innocent of the charged offenses.  Petitioner thus is not entitled to the protection of an equitable exception to the statute of limitations.

In summary, the Court concludes that the petition was untimely.

Accordingly, Respondent's motion to dismiss the petition for untimeliness will be granted.

V.   <u>Motion for Release</u>

In the petition, Petitioner moved for release on bail or her own recognizance because she believed that the facts of her case

36

warranted release, and she asserted that there was a reasonable possibility that her conviction would be reversed.  (Pet., doc. 1, 128-33.)  Respondent filed opposition on October 22, 2013, and Petitioner filed a reply on November 12, 2013.

The Ninth Circuit Court of Appeals has expressly declined to decide whether a district court has the authority to release a state prisoner on bail pending resolution of habeas proceedings.  In re Roe, 257 F.3d 1077, 1080 (9th Cir. 2001).  However, even if it is assumed for the sake of analysis that a district court has such authority, federal courts reserve bail pending resolution of a habeas corpus petition to "extraordinary cases involving special circumstances" and where there is a high probability of the petitioner's success on the merits.  United States v. Mett, 41 F.3d 1281, 1282 (9th Cir. 1994) (quoting Land v. Deeds, 878 F.2d 318, 318-319 (9th Cir. 1989)).  Further, the petitioner must show circumstances that make him exceptional and especially deserving of special treatment in the interests of justice.  Benson v. California, 328 F.2d 159, 162 (9th Cir. 1964).  The Court must also consider the petitioner's risk of flight and the danger to the community should the petitioner be released.  Marino v. Vasquez, 812 F.2d 499, 508-09 (9th Cir. 1987).

None of these requirements has been met in the case before the Court.

Further, because the petition will be dismissed as untimely,

37

1   the motion is subject to dismissal for mootness.

2      VI.   Petitioner's Motion for Discovery

3      In the petition, Petitioner moved for discovery, but a review

4   of the application indicates that Petitioner is moving for an

5   evidentiary hearing as well as to obtain evidence outside the state

6   court record.  (Pet., doc. 1, 134-40.)  Respondent filed opposition

7   to the motion on October 22, 2013.  Petitioner filed a reply on

8   November 12, 2013.

9      In light of the decision to dismiss the petition, Petitioner's

10  motion will be dismissed as moot.

11     VII.  Certificate of Appealability

12     Unless a circuit justice or judge issues a certificate of

13  appealability, an appeal may not be taken to the Court of Appeals

14  from the final order in a habeas proceeding in which the detention

15  complained of arises out of process issued by a state court.  28

16  U.S.C. § 2253(c)(1)(A); Miller-El v. Cockrell, 537 U.S. 322, 336

17  (2003).  A district court must issue or deny a certificate of

18  appealability when it enters a final order adverse to the applicant.

19  Rule 11(a) of the Rules Governing Section 2254 Cases.

20     A certificate of appealability may issue only if the applicant

21  makes a substantial showing of the denial of a constitutional right.

22  § 2253(c)(2).  Under this standard, a petitioner must show that

23  reasonable jurists could debate whether the petition should have

24  been resolved in a different manner or that the issues presented

25  were adequate to deserve encouragement to proceed further.  Miller-

26  El v. Cockrell, 537 U.S. at 336 (quoting Slack v. McDaniel, 529 U.S.

473, 484 (2000)).  A certificate should issue if the Petitioner shows that jurists of reason would find it debatable whether: (1) the petition states a valid claim of the denial of a constitutional right, and (2) the district court was correct in any procedural ruling.  Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

In determining this issue, a court conducts an overview of the claims in the habeas petition, generally assesses their merits, and determines whether the resolution was debatable among jurists of reason or wrong.  Id.  An applicant must show more than an absence of frivolity or the existence of mere good faith; however, the applicant need not show that the appeal will succeed.  Miller-El v. Cockrell, 537 U.S. at 338.

Here, it does not appear that reasonable jurists could debate whether the petition should have been resolved in a different manner.  Petitioner has not made a substantial showing of the denial of a constitutional right.

Accordingly, the Court will decline to issue a certificate of appealability.

VIII.  Disposition

Accordingly, it is ORDERED that:

1) Respondent's motion to dismiss the petition as untimely is GRANTED; and

2) Petitioner's motions for release and for discovery are DISMISSED as moot; and

///

///

3) The Clerk is DIRECTED to enter judgment for Respondent; and

4) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.


Dated:   **August 7, 2014**                    /s/ *Barbara A. McAuliffe*
                                         UNITED STATES MAGISTRATE JUDGE